**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JONATHAN J. GRIFFIN | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| US BANK NATIONAL ASSOCIATION, d/b/a AS | ) |
| TRUSTEE FOR TBW MORTGAGE-BACKED TRUST | ) |
| SERIES 2007-2, TBW MORTGAGE PASS THROUGH | ) Case No. 15-cv-06871 |
| CERTIFICATES SERIES 2006-A35; U.S BANCORP; | ) Hon. Hon. Jorge L. Alonso |
| OCWEN LOAN SERVICING, LLC; OCWEN | ) Magistrate Judge Daniel G. Martin |
| FINANCIAL CORPORATION; ALTISOURCE; CREDIT | ) |
| SUISSE FIRST BOSTON MORTGAGE SECURITIES | ) |
| CORP; CREDIT SUISSE MANAGEMENT, LLC;CREDIT | ) |
| SUISSE HOLDINGS (USA) INC., DLJ MORTGAGE | ) |
| CAPITAL, INC; WELLS FARGO BANK, N.A., WELLS | ) |
| FARGO &COMPANY; FARGO; T.D. FINANCIAL | ) |
| SERVICE CORPORATION;SECURITY CONNECTIONS | ) |
| , INC.; COLONIAL BANK, N.A. | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, JONATHAN J. GRIFFIN, by and through his attorney

HERB HILL and complaining against the Defendants and state as follows:

### NATURE OF THE ACTION

1.      This is an action by a consumer seeking damages, penalties and costs against the

Defendants named in this action for their individual and collective roles in a nationwide scheme of

illegal, unfair, unlawful, and deceptive business practices that evolved around the origination,

securitization, and servicing of the Plaintiff's mortgage.

2.      There are three main schemes to defraud at the heart of this complaint which evolve

around the origination, securitization, and servicing of Plaintiff's loan as described below:

a.      Wells Fargo Bank, N.A., ("Master Servicer" and "Trust

Administrator"); Credit Suisse First Boston Mortgage Securities Corp., ("Depositor"); TBW

Mortgage-Backed Trust 2007-2 ("Trust"); DLJ Mortgage Capital, Inc., ("Seller");Taylor Bean &

Whitaker Corp., ("Originator");  U.S. Bank, National Association, ("Trustee") and Colonial Bank ("Custodian") devised a scheme to defraud by misrepresenting Plaintiff's loan was securitized, thus allowing the parties to the securitization an opportunity to increase their corporate profits.

However, as described in this complaint, Plaintiff's loan was never securitized or properly assigned to the Trust. When the above Defendants needed to bring a foreclosure, the used a fraudulent mortgage assignment to conceal the fact that Plaintiff's loan never was assigned to the Trust.  Defendants actively and knowingly participated collectively by retaining Security Connections, Inc. ("SCI") to manufacture an assignment that misrepresented Plaintiff's loan had been assigned to the Trust. The purpose of this scheme was to meet the evidentiary requirements imposed by the Illinois courts and foreclosure law in foreclosure cases.

b.　　　Ocwen Loan Servicing, LLC ("OLS") subsequently became the servicer of Plaintiff's loan. When Plaintiff's loan allegedly went into default, Ocwen Financial Corporation, ("OFC"); OLS and Altisource engaged in a scheme to inflate its corporate profits by charging property inspection fees, property preservation fees, Broker Price Opinion Fees ("BPO"), and tax disbursement fees purportedly paid to Cook County. In connection with Plaintiff's loan modification agreement, OLS unfairly added the fees in ¶ b to Plaintiff's loan balance which was deceptive.

c.　　　OLS offered the Plaintiff a loan modification dated June 24, 2015. In an effort to conceal the true cost of the loan, OLS failed to give Plaintiff a Truth in Lending Disclosure ("TILA") which was unfair and deceptive. In an effort to increase its corporate profits, OLS failed to give the Plaintiff a proper payment schedule that represented the total, fully amortized principal and interest payment because OLS misrepresented the fact that after five years, the new modified payment would be additional income for OLS and OFC, which was not concealed from the Plaintiff.

3. The above scheme is carried out by means of a centrally controlled set of policies and practices and is implemented with form documents, form notices and uniform accounting mechanisms. The scheme and practices described in ¶ a and b are misleading and deceptive under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et. seq,* Truth in Lending Act ("TILA") 15 U.S.C § 1601 *et seq,* and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") 815 ILCS 505/2 *et. seq.*

## JURISDICTION AND VENUE

4. Subject matter jurisdiction is conferred upon this Court by 15 U.S.C §1640(e) and 28 U.S.C. §§1331, 1337, as the action arises under the laws of the United States. The Court supplemental jurisdiction over state law claims under 28 U.S.C. §1367.

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Defendants conduct business in the Northern District of Illinois and all of the events or omissions giving rise to the claims occurred within the Northern District of Illinois.

## PARTIES

6. Plaintiff JONATHAN J. GRIFFIN ("Griffin") is natural person residing in the Northern District of Illinois.

7. Defendant US BANK NATIONAL ASSOCIATION, d/b/a AS TRUSTEE FOR TBW MORTGAGE-BACKED TRUST SERIES 2007-2, TBW MORTGAGE PASS THROUGH CERTIFICATES SERIES 2006-A35 ("US Bank") has its principal place of business in Cincinnati, Ohio, with over a thousand offices across the United States, including several in Illinois and in this District. US Bank is an FDIC-insured financial institution, and it owns or purports to own home loans and investments secured by properties. US Bank does business under various names, including U.S. Bank National Association, as Trustee for TBW Mortgage-Backed Trust Series 2007-2, TBW Mortgage Pass-Through Certificates, Series 2007-2, and under such

name, US Bank is the trustee to the Pooling and Servicing Agreement ("P&S Agreement") purportedly governing assets, securities, and/or ownership interests inclusive of Plaintiff's subject mortgage and on information and belief delinquent or defaulted loans. U.S. Bank is a national banking association and a wholly-owned subsidiary of U.S. Bancorp.

8.      U.S. Bancorp is a corporation with its principal place of business at 60 Livingston Ave, EP-MN-WS3D, St. Paul Minnesota 55051

9.      Defendant, OCWEN FINANCIAL CORPORATION ("OFC") is a Florida Corporation with its principal place of business located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33146that maintains offices in Arizona, California, Florida, Georgia, and New York, with global operations in Canada, Germany, Uruguay, and India.

10.      Defendant, OCWEN LOAN SERVICING, LLC ("OLS") is a wholly-owned and controlled subsidiary of OFC, ostensibly formed for the sole purpose of carrying out OFC business, and shares the same business address as OFC.

11.      OLS is a loan servicing company that is in the business of purchasing and servicing mortgage loans which are in default. According to Ocwens website, "Ocwen is the industry leader in servicing high-risk loans." See www.ocwen.com, "About Us: Our Company."

12.      At all times herein mentioned, both individually and collectively, and affiliates not herein named, are and were agents of each other, and in doing the acts alleged herein were acting within the course and scope of such agency.

13.      OFC and OLS had actual ad/or constructive knowledge of the acts of each other, ad ratified, approved, joined in, and/or authorized the wrongful acts of each other, and or retained the benefits of said wrongful acts.

14.      OFC and OLS aided and abetted, encouraged, and rendered substantial assistance to each other in committing the acts alleged herein all while knowingly and willfully conspiring

and engaging in a common enterprise by engaging in a common course of conduct to accomplish the wrongs complained herein to financially benefit the Defendant at the expense of the Plaintiff by engaging in this unlawful conduct.

15.    OLS uses the mails and telephone system in conducting its business.

16.    Altisource Portfolio Solutions, Inc. is a separately incorporated affiliate of OFC, and a subsidiary of Altisource Portfolio Solutions with a principal place of business in Atlanta, Georgia.

17.    Altisource and OLS share employees. At all times relevant to this complaint, OFC, OLS and Altisource, both individually and collectively, together with affiliates not herein named, are and were joint ventures of each of the other Defendants, and in doing the acts alleged herein were acting within the scope of such agency.

18.    Defendant Wells Fargo Bank, N.A. is a national banking association and maintains corporate trust offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045.

19.    Wells Fargo Bank is a national banking association and a wholly-owned subsidiary of Wells Fargo & Company.

20.    Wells Fargo and Company is a U.S. bank holding company providing banking, insurance, trust, mortgage and consumer finance services throughout the United States and internationally with its corporate address at 420 Montgomery Street, San Francisco, CA 94104.

21.    Credit Suisse First Boston Mortgage Securities, Corporation was incorporated in the state of Delaware, as a wholly owned subsidiary of Credit Suisse Management, LLC, who is a indirect wholly-owned subsidiary of Credit Suisse Holdings (USA), Inc.  The principal executive offices of Credit Suisse First Boston Mortgage Securities, Corp., are located at 11 Madison Avenue, New York, N.Y. 10010.

22.     DLJ Mortgage Capital, Inc is a wholly-owned subsidiary of Credit Suisse Holdings (USA), Inc

23.     TD Service Financial Corporation provides technology services to the mortgage banking industry with its corporate address located at 4000 W. Metropolitan Drive, 400 Orange, CA 92868.

24.     Security Connections, Inc., is a wholly owned subsidiary of TD Service Financial Corporation with its corporate address at 240 Technology Drive, Idaho Falls, ID 83401.

25.     Non-Defendant Taylor, Bean & Whitaker Corp. was the originator of Plaintiff's loan which went bankrupt.

26.     Colonial Bank, N.A. is the custodian for the Trust.

27.     Defendant TBW Mortgage-Backed Trust 2007-2 is a common law trust formed under the laws of the State of New York with an address of 11 Madison Avenue, New York, N.Y. 10010.

**The Securitization Process for the TBW Mortgage-Backed Trust 2007-2**

28.     The process through which Residential Mortgage Backed Securities ("RMBS") are created and sold is known as mortgage securitization. In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

29.     The first step in each securitization is the origination of the mortgage.

30.     On February 13, 2007, Plaintiff obtained a $114,750.00 loan from Taylor, Bean and Whitaker Mortgage Corp. (the "Originator" or "Sponsor")  which granted a mortgage interest in the property commonly known as 9955 S. May street, Chicago, IL 60643, which actually did happen.

31.     The second step in the securitization is generally the acquisition of Plaintiff's mortgage loan from Taylor, Bean and Whitaker Mortgage Corp., along with other loans that Taylor, Bean and Whitaker Mortgage Corp. had originated known as a mortgage pool from DLJ Mortgage Capital, Inc., (the "Seller") who pursuant to an assignment assumption agreement must acquire all the loans from the pool by May 1, 2007, the cut-off date.[1]

32.     DLJ Mortgage Capital, Inc., (the "Seller") sells the pool of loans to a depositor, typically a special-purpose affiliate of the sponsor. In this case, the depositor is Credit Suisse First Boston Mortgage Securities, Corp. (the "Depositor")[2]

32.     Credit Suisse First Boston Mortgage Securities, Corp. (the "Depositor") is supposed to convey the pool of loans to a trustee "U.S. Bank, National Association" (the "Trustee") without recourse, on May 30, 2007, the closing date for the trust.[3]

33.     On the closing date the TBW Mortgage-Backed Trust, 2007-2 (the "Issuing Entity or "Trust") will become a common law trust formed under the laws of the State of New York, pursuant to the Pooling and Servicing Agreement. ("PSA")

34.     Each securitization includes various prioritized "tranches" of interest in payments to be made by borrowers on the loans. The Trust, "TBW Mortgage-Backed Trust, 2007-2" issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to the investors. The sponsor, "Taylor, Bean and Whitaker Mortgage Corp." earns a profit on the excess of the proceeds of the sales to of certificates to the underwriter over the cost of purchasing the mortgage loans. Here, U.S. Bank, National Association, acted as the trustee in connection with the RMBS transactions.

---

[1] There is no evidence of this transaction taking place.
[2] There is no evidence of this transaction taking place.
[3] There is no evidence of this transaction taking place.

35.     Pursuant to the PSA, on May 30, 2007, Credit Suisse First Boston Mortgage Securities, Corp. will sell, transfer, assign, set over and otherwise convey without recourse to U.S. Bank National Association in trust for the benefit of the certificate holders.

36.     In connection with such transfer and assignment, the depositor will deliver or cause to be delivered to U.S. Bank National Association, or Colonial Bank, N.A., Plaintiff's mortgage file, the original promissory note, or mortgage note, and any modification or amendment thereto endorsed in blank without recourse.  Assignments of the mortgage loans to the trustee or its nominee will be recorded in the appropriate public office for real property records.

37.     Pursuant to the PSA for the Trust, U.S. Bank National Association, Wells Fargo as the trust administrator and Master Servicer, Credit Suisse First Boston Mortgage Securities Corp, Taylor, Bean & Whitaker in which OLS is now the servicer, were supposed to act on behalf of the Trust and were only to perform those actions on behalf of the Trust that are specified in the PSA and other relative agreements.

38.     The PSA clearly defined the roles and duties of the parties, which in most cases including the originating lender, the Arranger, Servicers, and Trustee. The PSA established how the parties would share in the profits and losses, who had indemnification rights and obligations, the standards the originators had to meet, who was responsible for servicing and underwriting, who controlled various aspects of the deal, the classes of the securities that would be created, and the schedule of distributions to the investors.

39.     The Trustee's material duties under the PSA were to:

- directly or through Colonial Bank, N.A. (the "Custodian") hold the mortgage notes, mortgages and other legal documents in the mortgage files relating to all or some of the mortgage loans;

- directly or through Colonial Bank, N.A. (the "Custodian") to review each mortgage file and deliver a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

40.     Wells Fargo, as the Master Servicer of the Trust and according to the PSA, is responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance under the PSA.

41.     Wells Fargo also reviews the servicing of defaulted loans for compliance with the terms of the PSA. Wells Fargo has been in the business of master servicing since June 30, 1995 as has much experience with residential mortgage-backed securities.

42.     Wells Fargo as the trust administrator also acts as a paying agent, certificate registrar and authenticating agent under the PSA. Wells Fargo.

43.     Colonial Bank, N.A., as custodian will hold the mortgage notes, mortgages and other legal documents in the mortgage files for the benefit of the certificate holders in a fire-resistant facility.

44.     Wells Fargo, as master servicer will oversee and enforce the servicing of OLS in accordance with the servicing provisions of the PSA. If the servicer fails to perform in accordance with the terms of the Servicing Agreement, Wells Fargo is required to terminate the servicer and find a successor.

45.     According to the PSA, before any distribution are made on the certificates and from interest payments on the mortgage loans, the servicer will be paid a monthly fee equal up to .25% annually on the total principal balance on each loan.

46.     Expenses of the servicer, the master servicer, and the trustee that are permitted to be reimbursed under the PSA will be paid prior to any distributions to the certificate holders.

47.     Pursuant to the PSA, when a loan is in default, the servicer is permitted to make a modification if it is in the best interest of the certificate-holders.

48.     As a servicer, OLS collects monthly payments of principal and interest on mortgage loans and after deducting any reimbursable expenses and advances and its servicing fee, the servicer will forward all collections on the mortgage loans with any advances that it makes for delinquent principal and interest payments to Wells Fargo, the Trust Administrator.

49.     On each distribution date, Wells Fargo distributes the amount remitted to it by the servicer, after deducting from such amount any reimbursable expenses and other amounts, to the certificate holders.

50.     U.S. Bank National Association earned various forms of compensation in connection with its role as trustee, including an annual fee based on the percentage of principal outstanding on the underlying loans in the Trust

## BACKGROUND

### A.     The Making Home Affordable Program

51.     Beginning in the fall of 2008, the federal government instituted several measures to try and stabilize the housing and credit markets and assist troubled borrowers.

52.     On October 2008, the Emergency stabilization Act of 2008 (EESA) was passed to promote stability and liquidity in the financial system.  Among other things, the EESA authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program (TARP). Tarp funds were used, in part, to promote various mortgage loan modification programs.

53.     In March 2009, the United States launched the Making Home Affordable Program. ("MHA") The MHA Program included the Home Affordable Modification Program ("HAMP") a treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first-lien mortgages.

54.     HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that

monthly payments of homeowners who are in default or at imminent risk of default will be reduced to affordable or sustainable levels.

55.     Ronald Farris, President of OLS, executed on behalf of OLS on April 16, 2009 a Commitment to Purchase Financial Instrument and Servicer Participation Agreement with Fannie Mae as financial agent for the United States. On or about September 9, 2010, Farris executed an Amended and Modified Commitment to Purchase Financial Instrument and Servicer Participation Agreement with Fannie Mae as financial agent for the United States (accepted by Fannie Mae on September 15, 2010). OLS continues as a HAMP participant and the obligations, representations, warranties and covenants of OLS under its agreement survive the expiration or termination of its agreement effective September 9, 2010.

## FACTUAL ALLEGATIONS

### A.     The Loan

56.     On February 13, 2007, Griffin executed a 30-year mortgage loan and note ("subject loan") in the amount of $114,750.00 in favor of Taylor Bean & Whitaker Mortgage Corp. A copy of the note is attached as Exhibit A.  A copy of the mortgage is attached as Exhibit B.

### B.     The Foreclosure

57.     On or around October of 2012, Griffin was experiencing some hardship with making the payments as a result of his tenants paying late and fell behind on his payment beginning November 1, 2012.

58.     On March 3, 2013, OLS acquired the servicing rights for Griffin's loan.

59.     On August 27, 2013, US Bank filed a foreclosure against the property and Griffin in Cook County, Illinois with the case # 2013 CH 19691.

## C. The Assignment

60.     On or about February 6, 2013, Griffins mortgage was purportedly assigned to U.S. Bank National Association pursuant to a Corporation Assignment of Real Estate Mortgage that was prepared by Security Connections, Inc. A copy of the assignment is attached as <u>Exhibit C.</u>

61.     Security Connections Inc., ("SCI") is a subsidiary of TD Financial Services who has the expertise to prepare and record assignments of mortgage and mortgage satisfactions. On SCI's website it states: "If you are missing documents, or need a mortgage recorded, we have a highly trained department with the skills to locate ("meaning create") and record these documents.

62.     The document purported to be an assignment alleged that MERS as Nominee for Taylor, Bean & Whitaker Mortgage Corp., hereby grants, assigns, and transfers to U.S. Bank National Association, as Trustee for TBW Mortgage Backed Trust Series, 2007-2, TBW Mortgage Pass-Through Certificates, Series 2007-2.

63.     The document was dated February 6, 2013, signed by Sarah Hix as Assistant Secretary, and notarized by Katherine Larrea, and bore a stamp showing that it had been recorded with the Cook County Recorder of Deeds on March 8, 2013.

## D. Loan Modification from Ocwen Loan Servicing

64.     On March 6, 2015, Griffin applied for a loan modification from OLS.

65.     On April 24, 2015 OLS sent Griffin a proposed modification agreement ("the Agreement") which included a letter laying out the terms of the modification.  <u>Exhibit D</u>

66.     The first paragraph of the Agreement stated: "Ocwen Loan Servicing, LLC ("Ocwen") is offering you this Loan Modification Agreement ("Agreement"), dated 4/24/2015, which modifies the terms of your home loan obligations as described in detail below":… The Agreement further stated: "Pursuant to our mutual agreement to modify your Note and Mortgage

and in consideration of the promises, conditions, and terms set forth below, the parties agree as

follows labeled as their respective paragraph:

1. "In order for the terms of this modification to become effective, you promise to make an initial payment of $883.82 on or before 6/1/2015 and one (1) equal monthly payments of principal and interest in the amount of $662.07 and any escrowed amount as outlined in section 3 below, to Ocwen ("Trial Period") beginning on 7/1/2015, and thereafter due on the same day of each succeeding month."

2. "You agree that, at the end of the Trial Period, the new principal balance due under your modified Note and Mortgage will be $139,598.43. Upon modification, your Note will become current and you will not be in default."

4. "If you successfully complete the Trial Period, your loan will automatically be modified pursuant to the terms of this Agreement (the "Modification"). However, if you fail to send any full payment on or before the respective due date during the Trial Period, the Trial Period will immediately terminate and the Modification offer will be null and void…"

67.     On April 27, 2015 OLS sent Griffin a stamen in the mail alleging that his new

payment amount beginning June 1, 2015 would be $1,325.00 based on an escrow analysis. Exhibit

E.

68.     On April 30, 2015, Griffin received a letter from Morris Laing Evans Brock &

Kennedy ("MLEBK"), which was signed by Justin F. Carter informing him OLS has indicated

Griffin was eligible for a trial loan modification plan and the new monthly payment under the plan

would be $883.82 beginning July 1, 2015, with the initial down payment due on June 1, 2015. The

letter also stated that if Griffin was interested in the modification plan, Mr. Carter would draft a

settlement agreement. Exhibit F

69.     On May 13, 2015, Griffin signed the Loan Modification Agreement and sent it to

OLS.

70.    **REDACTED**                                              <u>Exhibit G</u> **filed Under Seal**

71.    **REDACTED**

72.    Griffin reviewed the Agreement and did not feel there was a compromise.

73.    **REDACTED**

74.    **REDACTED**

75.    **REDACTED**

76.    **REDACTED**

77.    **REDACTED**

78.    **REDACTED**

79.    Griffin made the trial payment of $883.82 for the month of June which OLS accepted.

80.    On June 3, 2015, Griffin sent by registered and certified mail a Request for Information("RFI"), as further defined by Reg. X, 12 C.F.R. § 1024.36(a). <u>Exhibit H</u>

81.    The RFI requested information that sufficiently identified the Mortgage and properly specified information relating to the Mortgage as well as a breakdown of the numbers, fees, and costs that were used in approving him for a loan modification because he believed the numbers were wrong. Griffin also requested an explanation of how the escrows were calculated and the guidelines that were used in determining he was approved for a modification.

82.    On June 11, 2015, Griffin sent an e-mail to Katie McGlasson, an agent, employee of MLEBK asking if he had to sign the settlement agreement for his modification to be approved.

83.    On June 101 2015, Katie McGlasson, an employee of MLEBK replied to Griffin's and informed him as outlined in Mr. Carters letter sent on April 30, 2015, the settlement agreement must be signed in order for the modification to be accepted.

84.     On June 16, 2015, Griffin sent a follow up e-mail to Katie McGlasson to check status of the breakdown of the fees.

85.     On June 16, 2015 and June 18, 2015, Katie McGlasson replied to Griffin's email and informed him she was still waiting.

86.     On June 25, 2015, in response to Griffin's request for reinstatement figures, Katie McGlasson e-mailed Griffin the following figures:

| | |
|---|---|
| $107,682.65 | (Principal balance) |
| $22,124.54 | (Interest) |
| $243.66 | (Late Charges) |
| $230.00 | (Foreclosure fee) |
| $110.00 | (Projected Property Valuation Expense) |
| $200.00 | (Additional/Hourly/Court Appearance |
| $437.00 | (Filing Fee Complaint) |
| $52.00 | (Lis Pendens/NOPA) |
| $272.00 | (Service of Process) |
| $26.12 | (Certified Mail Cost) |
| $1,242.00 | (Civil Litigation) |
| $1,265.00 | (FC Thru Service Complete) |
| $562.18 | (Property Valuation Expense) |
| $600.00 | (Title Report Fee) |
| $394.50 | (Property Inspection Fee) |
| + $5,924.41 | (Escrow Advance) |
| **$141,366.06** | **Total Amount Due on or before July 1, 2015** <u>Exhibit I</u> |

87.     On July 6, 2015, OLS sent Griffin an annual escrow account disclosure statement alleging that he had a negative $705.25 deficiency and that he would need an additional $1,609.21 for his escrow balance. <u>Exhibit J</u>

88.     On August 3, 2015, Griffin made the payment of 883.82 as required in the Modification Agreement, which OLS accepted.

89.     On August 4, 2015, Griffin received the countersigned modification which was signed and dated July 24, 2015. <u>Exhibit K</u>

**E.     Ocwen Loan Servicing Misconduct**

90.     On November 16, 2015, OLS send Griffin a statement in the mail alleging he had a negative escrow balance of $790.45 and that there was a tax disbursement in the amount of $6.00 to the Cook County Treasurer. Exhibit L

91.     On November 16, 2015, OLS send Griffin annual escrow account disclosure statement alleging that he had a negative $568.70 deficiency and that he would need an additional $11,481.88 for his escrow balance. Exhibit M

92.     On January 22, 2015, OLS sent Griffin a multiple statements in the mail alleging he had a negative escrow balance of $3,855.52 and that there were property inspections , civil litigation fees, valuation expenses assessed to his account as detailed in the chart below and attached hereto. Group Exhibit N

| Date Assessed | Fee Description | Amount |
|---|---|---|
| 3/18/14 | Escrow adjustment | $6.00 |
| 4/1/14 | Civil Litigation | $370.00 |
| 4/3/14 | Property inspection | $15.00 |
| 4/22/14 | Valuation | $110.00 |
| 4/29/14 | Property Inspection | $15.00 |
| 5/21/14 | Property inspection | $15.00 |
| 6/17/14 | Property inspection | $15.00 |
| 7/14/14 | Property inspection | $15.00 |
| 8/7/14 | Valuation | $100.00 |
| 8/15/14 | Property inspection | $15.00 |
| 9/03/14 | Property Inspection | $15.00 |
| 9/22/14 | Civil Litigation | $100.00 |
| 10/9/14 | Civil Litigation | $200.00 |
| 10/17/14 | Property Inspection | $13.25 |
| 11/4/14 | Civil | $432.00 |
| 11/4/14 | Property Inspection | $13.25 |
| 12/22/14 | Property Valuation | $100.00 |
| 1/6/15 | Property Inspection | $13.25 |

93.    On February 15, 2016, OLS sent Griffin a statement in the mail alleging he had a negative escrow balance of $93.98 and there was a property valuation expense assessed to his account in the amount of $110.00 on January 22, 2016. Exhibit O

94.    On March 15, 2015, OLS sent Griffin a statement in the mail alleging he had a negative escrow balance of $858.65 and there was a Cook County Tax Disbursement expense assessed to his account in the amount of $6.00 on February 29, 2016. Exhibit P

95.    On April 15, 2015, OLS sent Griffin a statement in the mail alleging he had a negative escrow balance of $605.68 and there was a property valuation expense assessed to his account in the amount of $12.25 on April 14, 2016. Exhibit Q

96.    On May 16, 2015, OLS sent Griffin a statement in the mail alleging he had a negative escrow balance of $352.71 and past due other fees in the amount of $97.75. Exhibit R

97.    On June 15, 2015, OLS sent Griffin a statement in the mail alleging he had a negative escrow balance of $99.74 and past due other fees in the amount of $97.75. Exhibit S

98.    On July 15, 2015, OLS sent Griffin a statement in the mail alleging he had a positive escrow balance of $153.23 and past due other fees in the amount of $97.75. Exhibit T

99.    On no occasion has Griffin received any communication from OLS, OFC, or Altisource setting forth any reason for any inspection to the property or a continuing series of inspections to the property considering it was occupied and OLS was aware because they had a copy of the lease and its yearly terms.

**Scheme to Defraud**

100.    Mostly beginning in 2004, hundreds of thousands of residential mortgages were bundled together (often in groups of 5,000 mortgages), and investors were offered the opportunity to buy shares of each bundle, a Mortgage Backed Security. ("MBS")

102.     Investments were made in the MBS, based on a prospectus, which had to be filed with the Security Exchange Commission. ("SEC") The MBS would be rated "AAA" by a rating agency, usually Moody's or Standard & Poors in order to invoke a sense of the investors.

103.     The prospectus was created, the MBS rated and the investor's money was pledged and collected long before the homeowners such as Mr. Griffin even applied for a loan.

104.     In other words, the MBS was created first. The loans fitting the description of those found in the prospectus had to be then be created and originated.  This was Taylor, Bean & Whitakers role, to originate Mr. Griffin's mortgage.

105.     Each bundle of mortgages was given a name. The bundle Mr. Griffin's loan was bundled in is TBW Mortgage-Backed Pass-Through Certificates, Series 2007-2/ TBW Mortgage-Backed Trust 2007-2. The name indicates information about the particular trust, such as the year it was created and closed and its reference name and number for the SEC and IRS.

106.     As required by the SEC, the Trust has a Pooling and Servicing Agreement ("PSA") which must be publicly filed. The purpose of the PSA is for the administration and distribution of funds to the investors and the obligations of the so called parties involved in the securitization of Mr. Griffins loan. See Amended Compl. ¶¶31-37. The investors who put up the money for the MBS are not parties to the PSA.

107.     The PSA sets forth what happens after the mortgages are bundled together. The PSA sets forth a cut-off date is which Mr. Griffins loan must be identified and set out in the SEC, which was May 1, 2007.

108.     Like the cut-off date, the TBW Mortgage-Backed Trust 2007-2 had a closing date in which Mr. Griffins mortgage was to be transferred to the Depositor, Credit Suisse First Boston Mortgage Securities, Corp., who then in turn was supposed to transfer Mr. Griffins mortgage and loan to Colonial Bank, N.A. or U.S. Bank, National Association for the benefit of the investors.

109.     Colonial Bank, N.A. must certify that it had possession of Mr. griffin's loan, the original Promissory Note, all original endorsements, and assignments transferring the Note and proof of ownership that the Note has been transferred. This proof was required by a written assignment by the closing date of May 30, 2007.

110.     In this case, when U.S. Bank National Association (U.S. Bank") as Trustee, was going to have a foreclosure complaint filed against Mr. Griffin, U.S. Bank, OLS, Wells Fargo, and Colonial Bank conspired to have an assignment created.

111.     U.S. Bank, OLS, Wells Fargo, and Colonial Bank retained Security Connections, Inc ("SCI") to create an assignment for the sole purpose of facilitating a foreclosure to use as evidence that U.S. Bank had standing.

**(i) Security Connections, Inc and TD Service Financial Corporation ("TD")**

112.     SCI is a subsidiary of TD, and is in the business of creating documents to facilitate illegal and wrongful foreclosures. SCI and TD have created, signed, and had recorded hundreds of documents for financial institutions in the mortgage industry which include mortgage assignments like the one in Mr. Griffin's case.

113.     SCI creates these documents through highly computerized, assembly line procedures.

114.     SCI signers sign their name on thousands of documents per day without reading the documents they sign and without verifying the information contained in the document-even in documents that claim to be made under oath and based upon the signatory's personal knowledge.

115.     These kinds of practices are commonplace in the mortgage servicing industry in order to push to process foreclosures as quickly as possible.

116.     Exhibit C exemplifies a typical mortgage assignment created, signed, and recorded by Security Connections, Inc.

115. This assignment was recorded with Cook County.

116. This assignment was signed by Sarah Hix, as purported Assistant Secretary of Mortgage Electronic Registration Systems. ("MERS")

117. Sarah Hix is not, however an Assistant Secretary for MERS in any traditional sense of the term; instead she is actually an employee of SCI.

118. Sarah Hix receives no compensation from MERS.

119. The assignment was created and recorded to paper over the gaps in the chain of title, and then used to initiate the foreclosure.

120. At the time of the assignment, Taylor, Bean & Whitaker was not in existence, had filed bankruptcy and had ceased to exist in 2011, therefore MERS could not assign anything to anyone.

121. The assignment also violated the terms of the PSA because Credit Suisse First Boston Mortgage Securities Corp, as the Depositor is the one who assigns the loan to US Bank, prior to May 1, 2007. This assignment was six years too late, and U.S. Bank did not own Mr. Griffins loan.

122. Taylor, Bean & Whitaker attempted, but failed to securitize Mr. Griffin's loan, by transferring it into the Trust after the closing date of the Trust had closed. In failing to transfer the loan, Taylor, Bean & Whitaker did not retain ownership, MERS has no ownership rights based on the Note, so the loan never became the property of the Trust.

123. Instead, it became the owner of an "unknown beneficiary" in which the above Defendants attempted to conceal by creating a fraudulent assignment.

**(ii) TBW Mortgage-Backed Trust 2007-2 history of misconduct**

124. The above described scheme is not new to the parties, as they have a history of this misconduct as an association-in-fact enterprise.

125.     The below parties will be called the TBW Trust Enterprise: Wells Fargo Bank, N.A., Credit Suisse First Boston Mortgage Securities Corp., TBW Mortgage-Backed Trust 2007-2, DLJ Mortgage Capital, Inc., Taylor Bean & Whitaker Corp[4]., U.S. Bank, National Association, and Colonial Bank.

126.     In Sandy Schaefer-Ung vs. US Bank, as Trustee for TBW Mortgage-Backed Trust Series 2007-2, TBW Mortgage Pass-Through Certificates, Series 2007-2, Mortgage Electronic Registration Systems, Inc,., Homeward Residential Inc., DLJ Mortgage Capital, Inc., Credit Suisse AG, f/k/a First Boston Mortgage Securities Corp., MISC12-469684 the same parties in the TBW Trust Enterprise participated in a scheme to defraud by creating an assignment, and foreclosing on a property it had no interest in.

127.     In US Bank, as Trustee for TBW Mortgage-Backed Trust Series 2007-2, TBW Mortgage Pass-Through Certificates, Series 2007-2, v Martinez in the State of New Mexico, No 34,935, the TBW Trust Enterprise participated in a scheme to defraud by creating an assignment, and foreclosing on a property it had no interest in.

128.     This is the common business practice of the TBW Trust Enterprise to create or have documents created when filing foreclosures and they lack the proper documents to show the TBW Trust Enterprise has the authority to foreclose.

**(iii) U.S. Bank National Association history of misconduct**

129.     U.S. Bank is involved in all aspects of the Residential Mortgage Backed Securities market.

130.     On January 5, 2012, a group of investors is several dozen MBS trusts issued written instructions to U.S. Bank as trustees to open investigations into large numbers of ineligible mortgage in the loan pools securing the trusts.

---

[4] Not named as Defendant because no longer exists but is necessary to describe the scheme

131.    The Comptroller of the Currency of the United States of America and U.S. Bank National Association, entered into consent orders regarding their unsafe and unsound lending practices as described in the consent order AA-EC-11-18 and #2013-128, which was later amended.

132.    U.S. Bank has actual notice of widespread loan defaults and breaches, but has failed to act in accordance with its obligation under the governing agreements under the PSA.

133.    U.S. Bank has knowledge that what they were doing was wrong is also demonstrated by its own actions in 2009. In September 2009, U.S. Bank filed claims in the bankruptcy action against Lehman for breaches of representations and warranties of more than 1 million mortgage loans included in the Lehman RMBS.

### (iv) Wells Fargo's History of misconduct

134.    Wells Fargo practices have been the subject to numerous governmental investigations and reports and private MBS suits.

135.    Wells Fargo systematic violations of representations and warranties regarding loans it originates or services on behalf of Trust.

135.    In *GSAA Home Equity Trust 2006-2 v. Wells Fargo Bank et al.*, **No.** 14-CV-4166, 2015 WL 5734389 (D.S.D. Sept. 30, 2015), the Judge refused to dismiss a lawsuit against Wells Fargo for failing to supervise as its role as a Master servicer.

136.    In October 2010, the Office of the Inspector General conducted a foreclosure review in connection to review Wells Fargo's servicing practices and found that it engaged in robo-signing and failed to supervise third parties.

137.    Reuters published a report that on July 19, 2011, stating that there has been some questionable validity that included the Trust's Master servicer Wells Fargo.  It is the same practices as alleged in Mr. Griffin's complaint that Wells Fargo continues to engage in.

### (v) Credit Suisse's History of misconduct

137. Credit Suisse, through its affiliate DLJ Mortgage Capital, was a major seller to Trusts, and was supposed to sell Mr. Griffin's loan to the Trust in this complaint. By January 2009, nearly a quarter of all loans within the Credit Suisse were delinquent. Credit Suisse was willing to sacrifice quality for quantity in an effort to make a profit.

138. A review of loan files in by MBIA in *MBIA v Credit Suisse Securities (USA) LLC, et at., Index* No. 603751/2009 (N.Y. Sup. Ct. December 14, 2009) demonstrates that DLJ routinely misrepresented the loans included in the securitization,

139. Investors reached the same conclusion regarding the defective loan collateral underlying Credit Suisse securitization. In *FHFA v. Credit Suisse Holdings (USA) Inc*., No. 11-cv-06200 (S.D.N.Y Sept. 2, 2011), FHFA conducted a review of the close to 10,000 files that revealed the majority of these loans contained breaches of underwriting guidelines or income/

### (v) Ocwens History of misconduct

140. In early 2012, examinations by the Multistate Mortgage Committee, which is comprised of state financial regulators, identified potential violations at OLS.

140. The CFPB and its partner states believed that OLS was engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process.

141. Specifically, the complaint alleged that OLS:

- Charged borrowers unauthorized fees for default-related services;
- Failed to effectively assist, and in fact impeded, struggling homeowners trying to save their homes.
- Failed to provide accurate information about loan modifications and other loss mitigation services;
- Failed to properly process borrowers' applications and calculate their eligibility for loan modifications;

- Provided false or misleading reasons for denying loan modifications;
- Engaged in illegal foreclosure practices; and

142.    The CFPB, together with Multistate Mortgage Committee obtained a Consent

Judgment requiring the largest nonbank mortgage loan servicer in the country, Ocwen Financial

Corporation, and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in first lien principal

reduction to underwater borrowers. The consent order can be found here.

https://nationalocwensettlement.com/

### First Claim
### Violation of Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. §1962(c)
### The TBW Trust Enterprise

143.    Griffin re-states and incorporates paragraphs 1-142.

144.    The below parties will be called the TBW Trust Enterprise: Wells Fargo Bank,

N.A., Credit Suisse First Boston Mortgage Securities Corp., TBW Mortgage-Backed Trust 2007-

2, DLJ Mortgage Capital, Inc., Taylor Bean & Whitaker Corp[5]., U.S. Bank, National Association,

Security Connections, Inc., and Colonial Bank.

145.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting,

or participating directly or indirectly in the conduct of, the affairs of the TBW Trust Enterprise

through a pattern of racketeering.

146.    Each if the Defendants named herein is an "enterprise" as defined in 18 U.S.C.

§1961 (4).

147.    The activities of the enterprise affect interstate commerce as the Defendants operate out of

different states.

148.    The above Defendants engaged in a pattern and practice of filing foreclosures without

evidence of a chain of assignment of the note and mortgage to the Trust.

---

[5] Not named as Defendant because no longer exists but is necessary to describe the scheme

149.    When the Defendants discovered the assignment was missing, each of them together devised, operated, and implemented a scheme to create a fraudulent document that misrepresented Mr. Griffins loan had been assigned to the Trust, when in fact it had not.

150.    To conceal this fact, Wells Fargo Bank, N.A., Credit Suisse First Boston Mortgage Securities Corp., TBW Mortgage-Backed Trust 2007-2, U.S. Bank, National Association, Security Connections, Inc., and Colonial Bank in concert created an assignment that falsely represented his loan had been assigned to the Trust.

151.    The assignment was false because Trust closed on May 30, 2007, and no loans could be assigned to the Trust after this date.

152.    The document purported to be an assignment dated February 6, 2013, was six years too late.

153.    The document also misrepresented that Sarah Hix had the authority to attest that an assignment had been done.

154.    Each Defendant was and is responsible for operating and managing the business affairs of the TBW Trust Enterprise described herein.

155.    U.S. Bank as Trustee directed and authorized an assignment to be created, Wells Fargo as master servicer knew Mr. Griffins loan had not been assigned to the Trust based on its duty as a Master servicer and Trust Administrator. Colonial Bank knew the loan had not been assigned to the Trust because its job was to hold the loans in a fire-proof vault.

156.    Credit Suisse knew Mr. Griffins note had not been assigned to the Trust, because although it got paid for the sale, it did not follow the proper protocol in assigning or selling the loan to the Trust.

157.    For the purpose of executing the scheme to defraud, the Defendant's in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, Defendants collectively and knowingly placed or caused

to be placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial and interstate carriers, or sent through the e-mail, including but not limited to the fraudulent assignment on February 6, 2013, March 8, 2013, and August 27, 2013.

158.    The practices complained in here could not have occurred without the use of mails and the internet.

159.    The Defendants misrepresentations, acts, and omissions were made for the purpose of deceiving Mr. Griffin.

160.    As a result of the Defendants practices, Mr. Griffin has lost equity in his property, been making payments to en entity that has no right to receive his payments because it is not the lawful owner, and has suffered fees and costs associated with the filing and defending the foreclosure.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this Honorable Court:

(1) Statutory damages;

(2) Litigation expenses and costs of suit; and

(3) Punitive Damages

(4) Such other or further relief as the Court deems proper.

**Second Claim**
**Violation of Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. §1962(c)**
**Ocwen Enterprise**

160.    Griffin re-states and incorporates paragraphs 1-161.

161.    The below parties will be called the Ocwen Enterprise and each one is an enterprise

as defined in 18 U.S.C. § 1961 (4): Ocwen Loan Servicing, LLC ("OLS"), Ocwen Financial Corporation ("OFC'), and Altisource.

162.    The activities of the enterprise affect interstate and commerce.

163.    OLS services mortgages in most states.

164.    OFC devised an implemented a scheme to defraud borrowers in default that began in 2008 by imposing default related fees such as "property inspection fees", "BPO fees", and or other default related fees to increase its profits which constitutes a scheme or artifice to defraud within the meaning of the federal mail and wire fraud statutes, 18 U.S.C §§1341 and 1343.

165.    OLS and OFC business model is to maximize revenues from loans in default without regard to whether it has a legal basis for the amounts it claims due.

166.    When OLS takes over loans, it routinely devises a scheme to improperly charge late fees, property inspection fees, valuation fees, and fails to honor is obligation to properly calculate or maintain escrow accounts.

167.    In addition, to any fees that OLS may pay, these fees are performed by its affiliate, Altisource in which it increases OFC corporate profits.

168.    The scheme implemented by OFC, OLS, and Altisource is designed to defraud homeowners, including Griffin.

169.    The revenue generated from these improper fees is included in OLS servicing revenue.

170.    Throughout the relevant time period, OLS, OFC, and Altisoiurce conspired to increase their financial profits by overcharging Griffin for his escrow account, foreclosure-related services including, without limitation, inspection fees, appraisals, broker's price opinions, and other fees as named in the monthly mortgage statements that were mailed to him beginning in November 2015 to the present as alleged in ¶¶90-98.

171. Erbey is the Executive Chairman of Ocwen and the Chairman of Altisource. In Ocwens second quarter report of 2014 to the SEC states that as of June 30, 2014, Erbey owned or controlled approximately 13% of Ocwen common stock and approximately 27% of Altisource common stock. Erbey directly benefited from Altisource charging Ocwen above-market rates for force-placed hazard insurance and for Foreclosure-Related Services.

177. The cost of the inflated fees charged by Altisource to Ocwen was passed on to Griffin and other homeowners.

178. Altisource provides or procures various mortgage servicing and Foreclosure Related Services for Ocwen including, but not limited to: force-placed hazard insurance, title searches, inspection fees, appraisals, property inspections, insurance services, default management, and origination management. Altisource Portfolio Solutions S.A., Quarterly Report (Form 10-Q), at 26 (July 29, 2014). Altisource reports that for the first six months of 2014, their revenue from Ocwen, their largest customer, for the mortgage services segment of their business relationship was $266.4 million dollars, accounting for 67% of its revenue. See id. at 8-9, 42. 66.

179. The New York State Department of Financial Services ("NY Department of Financial Services") has issued multiple letters to Ocwen detailing its concerns in Ocwens business relationships and dealings with its affiliated companies, Altisource.

180. OLS knew these fees were not authorized by the note and mortgage, were not bona fide fees, and were merely book entries.

189. Regardless of the property being occupied and OLS knowledge of it being occupied because it was in possession of the lease, OLS systematically charged these fees in violation of the Note and Mortgage.

190. It is OLS and OFC's business practice to charge borrowers who are delinquent multiple monthly property inspection fees.

191.    In *Grady v Ocwen Loan Servicing*, LLC 2013 U.S. Dist LEXIS 81514 (N.D. Ill., June 11, 2013, Ocwen charged the Plaintiff multiple property inspection fees which she sued Ocwen under the Fair Debt Collection Practices Act.

192.    In the National Mortgage Settlement Act, Ocwen was charged with charging borrowers monthly property inspection fees that were unreasonable and unnecessary.

193.    In 2005, a Texas jury awarded a Texas City woman $11.5 million from Ocwen Federal Bank. The jury found that Ocwen engaged in "a scheme of unfair, unlawful and deceptive business practices" in loan servicing. In 2005, *Guzman v. Ocwen*, in a Corpus Christi County Court, the jury awarded over 3 Million Dollars in settlement and found Ocwen having acted with "malice" in their criminal conduct supported by testimony adduced by two witnesses both of which were former employees of Ocwen. The evidence included making up numbers for payoffs with the numbers dreamed up so high that they insured a foreclosure posture instead of payoff, forgery of forbearance agreements, and testimony from two employees saying that the business of Ocwen is to create foreclosures by any means.

194.    In *Weiner v Ocwen Financial Corporation*, 14-cv-02597 in the Eastern District of California, Plaintiff  David Weiner OLS and OFC improperly assessed default related fees like the ones alleged in this complaint.

195.    The pattern of racketeering activity has a viable threat of continuity, because OLS and OFC continue to engage in this type of behavior on loans that it services that are in default because it is part of their financial plan.

196.    In addition to the above scheme, unlawful capitalized the unlawful fees in the loan modification it granted Mr. Griffin.

197.    The terms of the loan modification agreement failed to provide an accurate payment schedule representing the fully amortized principal and interest payments.

198.    After doing an amortization on the loan, it revealed that the after five years, OLS intended to keep the increased amount in Mr. Griffin's payment which was concealed from him.

199.    OLS sent this modification to Mr. Griffin in the mail on  April 24, 2015, and again on August 4, 2015.

200.    OLS routinely miscalculated Mr. Griffin's escrow account and sent him statements in the mail.

201.    The April 27, 2015, July 6, 2015, November 16, 2015 escrow account disclosure statement misrepresented Mr. Griffin's escrow account because he did not have a shortage as OLS alleged.

202.    It was OLS intention to keep the increased amount in the payment when his payment unfairly increased due to this alleged escrow shortage.

203.    This is OLS common business practice as alleged in a recent whistleblower suit in which an OLS employee revealed just how egregious and deceptive OLS and OFC deceptive practices are.

204.    OLS settled the whist blower lawsuit Case No. 4:12-cv-00543, in the U.S. District Court for the Eastern District of Texas, in which the Relators' who worked for Ocwen Loan Servicing in which he alleged Ocwen violated disclosures required by the Truth in Lending Act ("TILA") while servicing subprime mortgages under the Home Affordable Modification Program ("HAMP").

205.    The whistleblower suit also alleged OLS engaged in the following harmful and unlawful behavior, violating loss mitigation standards:

a) Inadequate staffing to accomplish goals of the loss mitigation programs; the association and hiring of inadequate and unqualified staff was compounded by the lack of training, education, experience and skills needed to perform the services for which the staff was hired;61

b) Failure to evaluate delinquent loans for all loss mitigation options within 30 days;62

c) Failure to evaluate delinquent FHA loans for loss mitigation options prior to the loan becoming four monthly payments past due or within 90 days of delinquency;63

d) Improper performance of modification underwriting;

e) Inadequate establishment of loan modification procedures;

f) Misplacing and failing to properly store loan modification documents;

g) Wrongful, fraudulent denial of modification applications;

h) Providing false/misleading information to borrowers;

i) Not responding timely to borrower inquiries;

j) Improper calculations of borrowers' eligibility for loan modifications;

k) Continuing to assess late fees when borrowers are in review for loss mitigation options;

l) Improper processing of modification applications, leading to denial; and

m) Off-shore loan underwriting and reviews resulting in wrongful, fraudulent denials due to misunderstanding, confusion, lack of experience, education, training and cultural misunderstandings.

206.    The suit further alleged the same conduct that occurred in Griffins complaint, that past due payments that were capitalized by OLS included the entire past due payment amount, including the principal portion of the payments which was unlawfully capitalized.

207.    While servicers are allowed to capitalize past due interest payments, there is no state or federal law which allows for the capitalization of principal that was never loaned to the borrower.

208.    This unlawful practice was implemented through the servicer's computer system, and was not performed manually, suggesting that it was applied equally to all loans.

209.    This pervasive practice amounted to a knowing and unlawful "taking" and an egregious violation of both state and federal UDAAP laws, all of which rendered OLS's [time

relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices….", **knowingly false.**

210.    Mr. Griffin has been injured by his payment increasing, having the bogus fees encumbered upon his loan, and paying the bogus charges,

211.    An award of punitive damages is appropriate because Ocwens conduct was outrageous, willful, and wanton, and it showed a reckless disregard for the rights of Griffin over a three year period.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this Honorable Court:

(1) Statutory damages;

(2) Litigation expenses and costs of suit;

(3) Treble Damage;

(4) Punitive Damages; and

(5) Such other or further relief as the Court deems proper

### Third Claim
### Violation of Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. §1962(c)
### Wells Fargo Enterprise

211.    Griffin re-states and incorporates paragraphs 1-210.

212.    The below parties will be called the Wells Fargo Enterprise and each one is an enterprise as defined in 18 U.S.C. § 1961 (4): Wells Fargo Bank, N.A ("Wells Fargo") and Wells Fargo & Company. ("WFC")

213.    The activities of the enterprise affect interstate and commerce.

214.    Wells Fargo services mortgages in most states.

215. Wells Fargo devised an implemented a scheme to be the Master Service of Mr. Griffin's trust and other Trusts to increase its profits by failing to supervise the servicers and performing its duty as master servicer and trust administrator which constitutes a scheme or artifice to defraud.

216. As a result of Wells Fargo failing to perform its duties according to the PSA, Mr. Griffin has suffered damages in that OLS has defrauded him, and he has made payments for years to an entity that does not own his loan.

217. The fees that Wells Fargo generated from the servicing and its role as a Trust Administrator were up-streamed to WFC, and WFC knew of Wells Fargo practices because it authorized it.

218. As a result of the fees generated from being a master servicer, WFC acquired access to service many other trusts which it also failed to perform its duties.

219. This pattern will continue into the future if not halted through this action.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this Honorable Court:

(1) Statutory damages;

(2) Litigation expenses and costs of suit;

(3) Treble Damage;

(4) Punitive Damages; and

(5) Such other or further relief as the Court deems proper

**Fourth Claim**
**Violation of Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. §1962(c)**
**TD Enterprise**

220. Griffin re-states and incorporates paragraphs 1-219.

221.     The below parties will be called the TD Enterprise and each one is an
enterprise as defined in 18 U.S.C. § 1961 (4): Security Connections, Inc ("SCI") and TD Service
Financial Corporation.("TD")

222.     The activities of the enterprise affect interstate and commerce.

223.     The TD Enterprise engaged in a scheme to defraud creating, signing, and having
recording in the Cook County Recorder's office documents purported to be assignments where the
signatory of the document claimed under oath to have personal knowledge of the information,
assertions, or averments contained in the document when, in truth and in fact, the signatory had no
such knowledge, creating, signing, and recording in the Cook County Recorder's office documents
that contained false, deceptive, or misleading information, assertions, or averments such as;

- claiming, under oath, that the signatory had conducted a review of the facts
  surrounding the purported transfer of a mortgage when, in truth and fact, the
  signatory had not conducted any such review; and

- claiming under oath, that the signatory had made a conclusion or determination
  based on the signatory's review of the purported transfers when, in truth and in
  fact, the signatory made no such conclusion or determination.

224.     Sarah Hix's name appears on thousands of mortgage assignments prepared by SCI
and filed throughout the states.  On each of these assignments, Hix identifies herself as an officer
of the grantor, when she in reality is just an employee of SCI. Group Exhibit V

225.     TD was aware that Sarah was signing her name and authorized it because it
increased their corporate profits.

226.     SCI and TD use various employees to sign names on these assignments and paid
notaries to falsely notarize the signatures.

227.     SCI and TD knew, or reasonably should have known these signatures were not

witnessed, the titles were false, and the signatures at times were false.

228.    This scheme to defraud was carried out by the use of mails and internet because each assignment had to be prepared, emailed or mailed to the recorders, and to the parties attempting to foreclose who had ordered them.

229.    As a result of the fraudulent assignment used in Mr. Griffin's, case, he was injured by having to defend a foreclosure by paying costs and attorney fees.

230.    This pattern will continue into the future if not halted through this action.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this Honorable Court:

      (1) Statutory damages;

      (2) Litigation expenses and costs of suit;

      (3)Treble Damage;

      (4) Punitive Damages; and

      (5) Such other or further relief as the Court deems proper

**Fifth Claim**
**Violation of Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. §1962(c)**
**Credit Suisse Enterprise**

231.    Griffin re-states and incorporates paragraphs 1-230.

232.    The below parties will be called the Credit Suisse Enterprise and each one is an enterprise as defined in 18 U.S.C. § 1961 (4): Credit Suisse Holdings (USA)("CSH"), Inc; DLJ Mortgage Capital, Inc; ("DLJ"); and Credit Suisse First Boston Mortgage Securities, Corporation; ("CSB")

233.    The activities of the enterprise affect interstate and commerce.

234.    CSB, as the Depositor of the Trust devised an implemented a scheme to make a

profit on the alleged sell of Mr. Griffin's loan to the trust to increase its profits of the parent

company, CSH.

235. CSB misrepresented that it had bought Mr. Griffin's mortgage from DLJ, its

subsidiary, yet it still got paid for the transaction as if the sale took place.

236. As a result of this fraud by omission. Mr. Griffin suffered damages by making

payments to an entity that did not own his loan, and to whom he did not owe.

237. The fees that were generated from this unlawful sale benefitted the enterprise.

238. As a result of the fees generated from this sale, the enterprise was able to have

access to other transactions involving the same scenarios as described herein.

239. This pattern will continue into the future if not halted through this action.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this

Honorable Court:

> (1) Statutory damages;
>
> (2) Litigation expenses and costs of suit;
>
> (3)Treble Damage;
>
> (4) Punitive Damages; and
>
> (5) Such other or further relief as the Court deems proper

**Sixth Claim**
**Illinois Consumer Fraud and Deceptive Practices Act ("Unfairness")**
**Ocwen Loan Servicing**

240. Griffin re-states and incorporates paragraphs 1-239.

241. Griffin meets the ICFA definition of "consumer." *See* 810 ILCS 505/1.

242. Ocwen violated 815 ILCS 505/2 by engaging in an unfair act because it

failed to review Mr. Griffin for a loan modification before initiating the foreclosure.

243. Ocwen is a participant in the Home Affordable Modification Program, and one

of the conditions is for Ocwen to send a certified letter or by Fed Ex/UPS informing him of his rights to be reviewed for a modification.

244.    However, Ocwen failed to send a letter by certified mail or Fed Ex, therefore Mr. Griffin's loan balance had increased $30,000.00 by the time he was approved for a modification.

245.    This was unfair because had Ocwen sent a certified letter, Mr. Griffin could have received a Modification when he was 120 days delinquent, not three years later.

246.    It was unfair for Ocwen to ignore the SPA, National Ocwen Settlement, MHA guidelines and proceed with a foreclosure without viewing Griffin for loss mitigation options. It was unfair for Ocwen to do the following:

    i.   File a foreclosure complaint without reviewing Griffin for all loss mitigation options;
    ii.  Failing to dismiss the foreclosure complaint after Griffin completed his trial payments;

    iii. # REDACTED

    iv.  Charging and billing to Griffins account $562.18 in property valuations;
    v.   Charging and billing Griffin $394.50 in property inspection fees;

247.    It was unfair for Ocwen to file a foreclosure complaint without reviewing Griffin for loss mitigation because when Ocwen received $1,835,624,254 in Trouble Asset Relief Project funds it promised to help borrowers like Griffin who is a tax payer.

248.    It was unfair for Ocwen to charge Griffin property inspection fees, property valuation fees when at all times the property was occupied by a tenant and OLS was aware of this because Mr. Griffin provided OLS with a lease, and he was actively participating in the state foreclosure case defending and protecting his interest and rights in regards to the property.

249.    Ocwens conduct is immoral, unscrupulous, unconscionable, and unethical in

that, instead of taking steps that would allow Griffin an opportunity to try and keep his home, Ocwen prematurely instituted foreclosure proceedings.

250. In so doing, Ocwen deprived Mr. Griffin from obtaining a loan modification within 60 days of being delinquent which is the time frame the Making Home Affordable guidelines require a servicer to make a reasonable effort to contact a delinquent borrower.

251. As a result of Ocwen failing to review Mr. Griffin within 60 days of being delinquent, he suffered damages in that his credit score reflects years of late payments, instead of a few months thus depriving him opportunities to be approved for credit; (b) his insurance premiums increased as a result of a lower credit score, and he suffered mental anguish and depression which caused him to see several doctors.

252. Ocwens conduct occurred in the course of trade or commerce.

253. Ocwen engaged in unfair conduct by violating the public policy of Illinois and the federal guidelines enacted by Congress.

254. Ocwen was aware Griffin was two months behind on his payment and failed to consider him for all loss mitigation programs prior to initiating the foreclosure.

255. Ocwen received $1,835,624,254 in TARP funds to bail them out during the financial crisis if it promised to help borrowers like Griffin, but chose instead to initiate a foreclosure and disregard its obligations to offer Griffin options that may have been available so he could try and save his home with a principal balance of $107,682.65 when he was 60 days delinquent.

256. All of Ocwens actions were the proximate cause of the damages to Mr. Griffin and that could have been prevented had Plaintiff satisfied its contractual and legal duties to make a reasonable effort to reach out him by certified mail within 60 days of becoming delinquent.

257.     Mr. Griffins principal balance is much higher than it would have been if he was evaluated and approved prior to the foreclosure complaint being filed so he has incurred excessive interest as well as the improper inspection fees and BPO fees have been added to his loan balance.

258.     All of the above practices complained of occurred in the course of conduct involving trade or commerce.

259.     An award of punitive damages is appropriate because Ocwens conduct was outrageous, willful, and wanton, and it showed a reckless disregard for the rights of Griffin over a three year period.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this Honorable Court:

(1) Statutory damages;

(2) Litigation expenses and costs of suit; and

(3) Punitive Damages

(4) Such other or further relief as the Court deems proper.

**Seventh Claim**
**Illinois Consumer Fraud and Deceptive Practices Act ("Deceptive")**
**Ocwen Loan Servicing**

260.     Griffin re-states and incorporates paragraphs 1-259.

267.     Griffin meets the ICFA definition of "consumer." *See* 810 ILCS 505/1.

268.     Ocwen violated 815 ILCS 505/2 by engaging in deceptive practices to collect the subject debt from Griffin.

269.     It was deceptive for Ocwen to;

    i.    **REDACTED**
    ii.   falsely claim each party would be liable for the own costs and attorney fees when the principal balance on his debt included attorney fees and costs;
    iii.  **REDACTED**

<ol type="i" start="4">
<li value="4">falsely charge Griffin for property valuations when they were not done and/or the fee was inflated by sending these statements in the mail every month while he was in default and after his loan was modified;</li>
<li value="5">falsely claim that if he made an initial payment and then a subsequent payment his foreclosure case would be dismissed but then failing to do so;</li>
<li value="6">It was deceptive for Ocwen to send Mr. Griffin five monthly mortgage statements on January 22, 2015 that misrepresented the amount in his escrow account and charge him for fees that were not legally due or owed.</li>
</ol>

270. Ocwen misrepresented the amount required for Mr. Griffin's escrow account because when his loan was modified, the past due amounts should have been capitalized, thereby making his escrow account current.

271. If Ocwen did not capitalize the proper escrow account, it was deceptive because Mr. Griffin's payment has now increased every month since November 2015.

281. The deceptive practices occurred in the course and conduct involving trade or commerce.

282. Ocwen intended Mr. Griffin to rely on its deceptive practices to induce payments above and beyond what was actually owed.

283. Ocwens conduct was the proximate cause of damages to Mr. Griffin that include illegal property inspection fees and charges being assessed to his mortgage balance, excessive interest, loss of equity in his home, emotional distress, lack of sleep, medical bills, and pain and suffering.

284. This conduct is part of a pattern and practice of behavior by which Ocwen routinely engages as part of its business model to falsely misstate the nature of outstanding "debts" and amounts "owed" to consumers for its own pecuniary gain.

285. An award of punitive damages is appropriate because Ocwens conduct was outrageous, willful, and wanton, and it showed a reckless disregard for the rights of Mr. Griffin.

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN requests that this Honorable Court:

(1) Enter judgment in his favor and against US Bank and Ocwen;

(2) Declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

(3) Award Griffin statutory, actual, and punitive damages, in an amount to be determined at trial, for the underlying ICFA violations;

(4). Award Griffin costs as provided under 815 ILCS 505/10a(c); and

(5). Award any other relief as this Honorable Court deems just and appropriate.

**Eighth Claim**
**Breach of Contract**
**Ocwen Loan Servicing and U.S. Bank National**

286.    Griffin re-states and incorporates paragraphs 1-285.

287.    Under Illinois law, every contract implies a covenant of good faith and fair dealing.

289.    Mr. Griffin has a valid and enforceable mortgage contract with Defendants in the form of a mortgage and note.

290.    Mr. Griffin substantially performed his duties under the contract by tendering all monthly payments to Defendants, and its assignor, and by complying with all of the other terms of the mortgage and note.

291.    U.S. Bank and Ocwen are in material breach of the subject note, mortgage, and note.

   a.    charging of unauthorized fees and costs;

   b.    failure to provide accurate repayment and reinstatement figures;

   c.    failure to provide an accurate accounting; and

   d.    failure to conduct its affairs in good faith.

292.     U.S. Bank and Ocwen further breached the express terms of the subject note and mortgage by charging and collecting property inspection fees, and BPO fees, Cook County recorder fees and costs, excessive insurance deposits that were not permitted by the mortgage and note.

293.     U.S. Bank and Ocwen breached the mortgage and note by improperly amortizing his loan modification payments in his loan modification agreement to make it appear his loan payment was scheduled to change in five years, when after running an amortization, no such increase of payment existed.

294.     U.S. Bank and Ocwens breach of the subject contract has caused Griffin damages that consist of illegal fees, excessive interest, damage to his credit report, loss of equity in his home, emotional distress, loss of consortium, and pain and suffering

WHEREFORE, Plaintiff JONATHAN J. GRIFFIN respectfully requests that this Honorable Court:

(1)     Find US Bank and Ocwen materially breached the mortgage contract;

(2)     award Griffin his actual damages to be proven at trial;

(3)     award Griffin his reasonable fees and costs; and

(4)     award Griffin other relief this Honorable Court deems equitable and just.

**Ninth Claim**
**Truth in Lending Act**
**Ocwen Loan Servicing**

295.     Griffin re-states and incorporates paragraphs 1-294.

296.     Griffin seeks remedy under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, to obtain the opportunity for redress, restitution, money damages, and attorney fees for Ocwens unfair and deceptive practices in violation of TILA, and its implementing Regulation Z, 12 C.F.R. § 226, *et seq.*,

297. Mr. Griffin modified his loan with Ocwen, but Ocwen failed to provide him with the necessary TILA disclosure statement.

298. Mr. Griffin was provided with a Loan Modification Agreement, without clearly and conspicuously disclosing:

    a.    the "total payments," and total amount that would be paid under the modified mortgage;

    b.    accurate payment schedules representing the total, fully amortized principal and interest payments being imposed on the loans each month;

    c.    the additional charges that would be assessed under the modified agreement;

    d.    the additional charges that would be computed into the principal balance under the modified agreement.

299. By not disclosing the total amount to be paid under the terms of the modified mortgage in its disclosures pursuant to regulation Z. § 226.18(h), Ocwen violated TILA's requirement that the disclosures be "clear and conspicuous," and misleads the ordinary borrower like Mr. Griffin as the true cost of the loan provided by Ocwen.

300. By not providing the total amount to be paid over the life of the loan, Mr. Griffin was required to use inference and perform his own calculations to determine the total which does not comport with the strict disclosure requirement.

301. The payment schedule in Mr. Griffins loan modification agreement does not provide an accurate payment schedule in accordance with Regulation Z, § 226.18(g), and is a violation of TILA.

302. Ocwens failure to disclose any additional charges apart from the unpaid principal balance plus earned finance charges that would be assessed under the modification agreement and computed into the principal is a violation of Regulation Z, § 226.20(a)(4).

303.     Ocwens failure to disclose the foregoing was intentional and deliberate, which confused Mr.

griffin, and did not conform with TILA's strict requirements for disclosures under 15 U.S.C. § 1601 *et seq.*,

nor its implementing Regulation Z, 12 C.F.R. § 226.


**JURY DEMAND**
Plaintiff demands trial by jury.



Respectfully submitted,


By: /s/ Herbert Hill
Attorney for Plaintiff


Herbert Hill
The Law Office of Herbert Hill
605 N. Broadway
Aurora, Illinois 60505
Atty No: 1214853
P:  630-742-0374