# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JONATHAN J. GRIFFIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 15 C 6871 |
| v. ) | |
| ) | |
| U.S. BANK NATIONAL ASSOCIATION, ) | Judge Jorge L. Alonso |
| as Trustee for TBW Mortgage-Backed Trust ) | |
| Series 2007-2, TBW Mortgage Pass ) | |
| Through Certificates Series 2006-A35, and ) | |
| OCWEN LOAN SERVICING, LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jonathan J. Griffin, asserts claims of breach of contract and deceptive and unfair conduct under the Illinois Consumer Fraud and Deceptive Business Practices Act, ("ICFA"), 815 ILCS 505/1 *et seq*, against defendants Ocwen Loan Servicing, LLC ("Ocwen") and U.S. Bank, National Association, as Trustee for TBW Mortgage-Backed Trust Series 2007-2, TBW Mortgage Pass Through Certificates Series 2006-A35 ("US Bank"), arising out of their servicing of his mortgage loan and attempt to foreclose on the mortgage. This case is before the Court on defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion.

## BACKGROUND

**Local Rules 56.1 and 56.2**

Local Rule 56.1 requires a party moving for summary judgment to provide "a statement of material facts as to which [he] contends there is no genuine issue." Local R. 56.1(a)(3). It also requires the opposing party to file "a concise response to the movant's statement" that includes,

"in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local R. 56.1(b)(3)(B). In addition, it states that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local R. 56.1(b)(3)(C).

Plaintiff did not file a response to defendants' Local Rule 56.1 Statement, nor did he file a timely or pertinent response brief. Nearly a month after his response was due and ten days after defendants filed their reply brief, plaintiff filed a document captioned as an "Objection" to the motion for summary judgment, but this document did not address the substance of the motion or of plaintiffs' claims. Accordingly, the Court deems plaintiff to have admitted all facts defendants assert in their Local Rule 56.1 Statement to the extent that there is evidentiary support for those facts in the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012); *see Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1108 (7th Cir. 2004) *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) ("We have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.") (internal alteration and quotation marks omitted).

The Court recognizes that there was some confusion about whether plaintiff was represented by counsel around the time of the filing and briefing of the present motion for summary judgment. This is significant because, when a party moves for summary judgment against a *pro se* opponent, the moving party is required to serve notice not only of the filing of the motion but also of what actions are necessary to properly oppose summary judgment. *See Dirig v. Wilson*, 609 F. App'x 857, 859 (7th Cir. 2015) ("When a defendant moves for summary judgment against an unrepresented [litigant], the [unrepresented litigant] must be notified 'of the consequences of

failing to respond with affidavits' or other evidence."), *see* Local R. 56.2 (codifying this rule and prescribing a form of notice under it). "Flawed notice" of the means of opposing a motion for summary judgment is fatal to the motion if it "actually results in prejudice" to a *pro se* litigant. *Morris v. City of Chi.*, 545 F. App'x 530, 532 (7th Cir. 2013) (citing *Kincaid v. Vail*, 969 F.2d 594, 599 (7th Cir. 1992)); *see Dirig*, 609 F. App'x at 860.

Prior to the filing of defendants' motion for summary judgment, plaintiff filed a copy of a "Termination Letter" he had sent to his counsel (ECF No. 126), in which he had informed counsel that his "services [were] no longer needed." Plaintiff's counsel subsequently filed a notice of withdrawal. (ECF No. 127.) But according to the local rules of this district, counsel must move for leave of court to withdraw his appearance; a mere notice of withdrawal is insufficient. *See* Local R. 83.17. Plaintiff's counsel did not move to withdraw at that time. Defendants reported in their reply brief that they had sent an email to plaintiff's counsel on June 13, 2018, a week after filing their motion for summary judgment, to ask if he intended to file a motion to withdraw, and they received no response. (*See* Defs.' Reply Br. at 2 n.2; *id.* Ex. A, Email from Att'y Brunner to Att'y Hill.) To guard against the possibility that "attorney-client communications had broken down," defendants sent the summary judgment materials directly to plaintiff personally, but he refused delivery. (Reply Br. at 2 n.2.) Under these circumstances, the Court considers plaintiff to have been represented by counsel at the time of the filing of the motion, so neither defense counsel nor the Court was required to provide him with notice under Local Rule 56.2.

Plaintiff's counsel ultimately did move to withdraw on March 11, 2019, long after briefing of the motion for summary judgment was to have been completed, and the Court granted the motion. (*See* Mar. 19, 2019 Minute Entry, ECF No. 148.) At a subsequent hearing, the Court granted plaintiff leave either to file a *pro se* appearance form or for substitute counsel to appear by

3

May 10, 2019, and it set a deadline for plaintiff to file a motion for leave to respond to defendants' summary judgment motion by the same date. (*See* Apr. 10, 2019 Minute Entry, ECF No. 151.) But plaintiff did not timely file anything meeting that description, instead filing a "series of somewhat incomprehensible documents" (*see* Jun. 18, 2019 Order at 1, ECF No. 158), none of which addressed the merits of the motion, the claims in the operative complaint (Am. Compl., ECF No. 99), or the underlying facts, nor did they explain why plaintiff had never made any pertinent response to the pending motion for summary judgment. The Court struck these documents as "incomprehensible" and impertinent to plaintiff's case (Jun. 18, 2019 Order, ECF No. 158), and it denied plaintiff's subsequent motion for reconsideration on similar grounds (Jul. 1, 2019 Order, ECF No. 164).

Had plaintiff seriously attempted in these filings to present and argue the claims he asserted in his complaint, the Court might warn him of his obligations in responding to a motion for summary judgment and give him another opportunity to meet them, but any such efforts would only delay the inevitable. "Plaintiff took absolutely no discovery of any kind to support his case" (Defs.' Jun. 14, 2019 Mot. to Strike, ECF No. 156), so the Court cannot imagine what evidence he could properly marshal in opposition to summary judgment, nor has he made any attempt in his numerous recent filings to assert facts in support of his claims; indeed, he has not addressed the substance of his claims at all. *Cf. Morris*, 545 F. App'x at 532 (*pro se* plaintiff cannot complain of flawed notice of obligations in opposition to summary judgment where he does not point to any evidence he has not had opportunity to raise).

Plaintiff might at least swear the allegations of his complaint in an affidavit, given the chance, *see Dirig*, 609 F. App'x at 860 ("Dirig was prejudiced [by inadequate notice of a summary judgment motion] because he alleged facts that, if sworn, would have created disputed issues of

4

material fact."), but that would bring him no closer to demonstrating a genuine issue of material fact for trial. As the Court will explain below, even assuming the truth of all the factual allegations of the complaint and of plaintiff's statements in his deposition testimony, defendants are still entitled to judgment as a matter of law.

**Factual Background**

On February 13, 2007, plaintiff took out a $114,750 loan secured by a mortgage on his house at 9955 South May Street in Chicago. (Defs.' LR 56.1 Stmt. ¶¶ 6-7, ECF No. 133.) Plaintiff also executed a rider to the mortgage deleting the condition that he occupy the property, and he executed an "Affidavit of Occupancy" specifying that the property was an "investment property," *i.e.*, it was "not owner-occupied." (*Id.* ¶¶ 8-9.) Plaintiff, a real estate investor, is the owner of Griffin & Associates Investments, LLC, to which he deeded the property in 2010. (*Id.* ¶¶ 10-11.)

Plaintiff rented out the May Street property and used the monthly rent payments to repay his mortgage loan, but in November 2012, when he had trouble with his tenant, he defaulted on the loan. (*Id.* ¶ 14.) Plaintiff's loan servicer at the time, Homeward Residential Inc. ("Homeward"), sent him a notice of default in December 2012. (*Id.* ¶ 16.) In January 2013, Homeward sent plaintiff a letter enclosing an application for a loan modification under the Home Affordable Modification Program ("HAMP"), a federal program implemented to help homeowners avoid foreclosure, *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556-57 (7th Cir. 2012) (explaining HAMP). (*Id.* ¶ 17.) Homeward sent plaintiff another such letter and application in February 2013. (*Id.* ¶ 18.)

Defendant Ocwen took over servicing of plaintiff's mortgage loan in March 2013. (*Id.* ¶ 12.) Ocwen promptly mailed plaintiff a letter, dated March 5, 2013, enclosing information regarding alternatives to foreclosure. (*Id.* ¶ 19.) In April 2013, Ocwen mailed plaintiff a letter

enclosing information regarding loan modifications and financial counseling. (*Id.* ¶ 20.) The following month, Ocwen sent plaintiff letters, dated May 2 and May 8, 2013, providing notice of default and enclosing information regarding loan modifications and financial counseling. (*Id.* ¶ 21.) On July 11, 2013, Ocwen mailed plaintiff a letter enclosing a notice about how to apply for a HAMP modification or inquire about other relief. (*Id.* ¶ 22.) Plaintiff did not submit an application for a loan modification or cure his default, nor did he inquire about a loan modification at that time. (*Id.* ¶ 23.)

On or about August 27, 2013, approximately nine months after plaintiff defaulted on his mortgage loan, US Bank, acting as trustee for the holder of the note and mortgage, filed a complaint for foreclosure in the Circuit Court of Cook County. (*Id.* ¶ 24; *see id.* ¶ 3.) Pursuant to the terms of the mortgage, which permits the lender to charge the borrower "fees for services performed in connection with Borrower's default," including "property inspection and valuation fees," Ocwen assessed plaintiff fees for property inspections and valuations. (*Id.* ¶¶ 26-27.) Specifically, after the loan went into default, Ocwen assessed fees for inspection and valuation services performed by its vendor, Altisource Solutions, Inc. ("Altisource"). (*Id.* ¶¶ 28-29.)

Plaintiff submitted an application for a loan modification, and in a letter dated April 16, 2015, Ocwen acknowledged receipt of the application. (*Id.* ¶ 31.) Plaintiff was denied a HAMP modification because his monthly payment was less than ten percent of his monthly income and the property was not his primary residence. (*Id.* ¶ 32.) However, Ocwen reviewed plaintiff's application for other non-HAMP modifications and approved plaintiff for an "in-house" loan modification (*id.* Ex. 1, Pl.'s Dep. at 66:6, ECF No. 134 at 20). (*Id.* ¶ 33.) An attorney representing US Bank in the foreclosure action sent plaintiff a letter, dated April 30, 2015, enclosing a proposed loan modification agreement and offering to "draw up the settlement agreement." (*Id.* ¶ 34.)

Plaintiff executed the loan modification agreement on May 13, 2015, and returned it to Ocwen. (*Id.* Ex. 1, Pl.'s Dep. Ex. 20, Loan Modification Agreement, ECF No. 134-1 at 66.)

In a series of emails in June and July 2015, US Bank's counsel and his secretary informed plaintiff that he "must execute the settlement agreement in order to accept the modification," and if he did not execute the settlement agreement, the modification would "not be implemented." (*Id.* Ex. 1, Pl.'s Sealed Dep. Ex. 8, Morris Laing Emails, ECF No. 138 at 147; *see id.* at 147-153.) Plaintiff was reluctant to execute the settlement agreement because of its broad release language, but he made the initial payments due during the loan modification agreement's "Trial Period" on June 1 and July 1, 2015. (*See* Loan Modification Agreement, ECF No. 134-1 at 64.)

During a July 31, 2015 hearing in plaintiff's foreclosure case, plaintiff reported to the court that US Bank's counsel had attempted to intimidate him into signing a settlement agreement including a broad release of claims, telling him that, if he did not sign, US Bank would not modify his loan and instead would proceed with foreclosure. According to plaintiff, he had already made the trial payments and believed that the loan modification agreement was therefore in effect, so, he argued, the foreclosure case should be immediately dismissed, regardless of whether he signed the settlement agreement. (*See* Pl.'s Dep. at 55:11-60:18; *id.* Sealed Ex. 18, Tr. of Jul. 31, 2015 Hr'g, ECF No. 138 at 201-07.) US Bank's counsel insisted that if plaintiff did not sign a "settlement release agreement that would dismiss this case and [plaintiff's] counterclaim with prejudice," then "that means that the case would not be settled." (Tr. of Jul. 31, 2015 Hr'g at 6:2-8.) The court did not dismiss the case at that time, explaining that only the issue of dismissing plaintiff's counterclaim, not the larger issue of dismissing the whole action, was before it.

On August 4, 2015, although plaintiff had not signed the settlement agreement, plaintiff received a letter from Ocwen enclosing a fully executed copy of the modification agreement,

7

countersigned and dated July 24, 2015. (Am. Compl. ¶ 60.) On September 2, 2015, the circuit court dismissed the foreclosure case. (Defs.' LR 56.1 Stmt. ¶ 41.)

## ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must be able to point to competent evidence to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The substance of the evidence must be admissible in a "form permitted by the Federal Rules of Evidence," although the "form produced at summary judgment need not be admissible" at trial. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

**I. ICFA CLAIMS**

"The elements of a claim under the ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod*, 673 F.3d at 574 (internal quotation marks omitted); *see Robinson v. Toyota*

8

*Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002).[1] "[A]lthough a *violation* of the [ICFA] may occur in the absence of damages, a *private cause of action* does not arise absent a showing of both a violation and resultant damages." *Duran v. Leslie Oldsmobile, Inc.*, 594 N.E.2d 1355, 1362 (Ill. App. Ct. 1992).

Plaintiff's "First Claim" is that defendants acted unfairly, in violation of the ICFA, by (1) failing to offer plaintiff a loan modification before filing a foreclosure action, allowing many more months of missed payments and associated fees and penalties to pile up, and (2) charging plaintiff property inspection and valuation fees unnecessarily, given that the property remained habitable and occupied. (Am. Compl. ¶¶ 61-80.) Plaintiff's "Second Claim" is that defendants acted deceptively, in violation of the ICFA, by (1) adding attorney fees and costs to the post-modification loan balance, although the proposed settlement agreement would have made each party liable for its own fees and costs; (2) charging plaintiff for property inspection and valuation services that were unnecessary and not actually performed; (3) failing to dismiss the foreclosure action promptly after executing the loan modification agreement, which provided that, "[i]f the Trial Period is successfully completed, any pending foreclosure action will be dismissed" (Loan Modification

---

[1] The ICFA applies to "consumers," defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1. Defendants argue that plaintiff is not a consumer for purposes of the ICFA because the May Street house is an investment property, not plaintiff's own residence. While defendants are correct that plaintiff does not live in the May Street house, they also recognize that non-consumers have standing to bring claims under the ICFA if they satisfy the "consumer nexus test" by showing that "the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Brody v. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 698 N.E.2d 257, 268-69 (Ill. App. Ct. 1998). Courts have found a sufficient consumer nexus where commercial plaintiffs are harmed by the defendants' deceptive practices while acting as consumers, in the sense that they are end-users of the defendants' products or services. *See Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217, 220 (Ill. App. Ct. 2003), *Brody*, 698 N.E.2d at 269, *Peter J. Hartmann Co. v. Capital Bank & Trust Co.*, 694 N.E.2d 1108, 1117 (Ill. App. Ct. 1998), *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 872 F. Supp. 2d 710, 729 (N.D. Ill. 2012). The Court assumes, without deciding, that there is a sufficient consumer nexus between defendants' alleged misconduct and consumer protections concerns to bring plaintiff's claim within the scope of the ICFA.

Agreement ¶ 9(e), ECF No. 134-1 at 65); and (4) misrepresenting the amount in plaintiff's escrow account because "when his loan was modified, the past due amounts should have been capitalized, thereby making his escrow account current" (Am. Compl. ¶ 84-85). (*See id.* ¶¶ 81-91.)

### A. Failure to Review Loan for Modification Prior to Foreclosure

The Court sees no unfairness in defendants' alleged failure to review plaintiff's loan for a modification prior to bringing a foreclosure action. First, plaintiff's allegations contradict the record of correspondence, which shows that defendants did *not* fail to offer plaintiff a loan modification; rather, defendants have produced records showing that Ocwen sent plaintiff five letters regarding HAMP or other modification or loss mitigation options, on top of the two its predecessor, Homeward, had already sent before Ocwen began servicing plaintiff's loan. All but one of these letters were properly addressed to plaintiff at his home, and that one was addressed to plaintiff at the May Street house.

Plaintiff insisted at his deposition that he had never seen these letters, which does not prove that they were not sent or not delivered. But even if they were not, plaintiff admitted that, prior to the filing of the foreclosure action, he never reached out to Ocwen to ask for a modification or for other help negotiating his default. The Court sees nothing unfair in defendants' exercising their right to file a foreclosure action against a borrower who has been in default for over eight months, without showing any sign of when or whether he would make another payment. After receiving no payments and hearing nothing from plaintiff for over eight months, defendants were entitled to exercise their rights under the loan and mortgage documents and take steps toward foreclosure. *Cf. LSREF3 Sapphire Tr. 2014 v. Barkston Properties, LLC*, No. 14 C 7968, 2016 WL 302150, at *7 (N.D. Ill. Jan. 25, 2016) (lender acted unfairly to the extent foreclosure was a "cynical[]

attempt[]" to take advantage of borrower's default to "acquire the . . . collateral," despite borrower's attempt to work out a modified payment plan).

Plaintiff claims that HAMP guidelines required defendants, as HAMP participants, to screen him for a modification within sixty days of default, but plaintiff himself alleges that the HAMP pre-screening requirement only applies to distressed loans secured by property "which is occupied by the borrower as their principal residence." (Am. Compl. ¶ 15.) Indeed, in 2015, Ocwen informed plaintiff that it could not offer him a HAMP modification precisely because the May Street property was not his primary residence. (Defs.' LR 56.1 Stmt. ¶ 32.) Defendants did not violate any duty under HAMP to proactively offer plaintiff a loan modification, nor, under the circumstances, does the Court see that defendants had any such duty under any other applicable law or contract.

### B. Fees for Property Inspection and Valuation Services

Next, plaintiff claims that it was both unfair and deceptive to charge fees for property valuation and inspection services after he defaulted on his loan. But defendants correctly point out that the mortgage expressly permits them to do exactly this (*id.* ¶ 26), and an act is not unfair or deceptive under the ICFA if it is expressly authorized by a written agreement between the parties. *Sklodowski v. Countrywide Home Loans, Inc.*, 832 N.E.2d 189, 197 (Ill. App. Ct. 2005) (citing *Robinson*, 775 N.E.2d at 962.) Plaintiff alleges that defendants did not actually perform the inspection and valuation services for which they charged him, but he admitted at his deposition that he had no evidence to support this allegation (*id.* ¶ 30), and defendants have produced reports provided by its vendor, Altisource, of inspection and valuation services performed during the default (*id.* ¶ 28). Plaintiff asserts that these services were unnecessary because the property remained occupied, but he does not explain, and the Court does not see, why the occupancy of the

house makes any difference. The mortgage gave defendants the right to take steps to "protect[] and/or assess[] the value of the Property" upon default (*see id.* ¶ 25), and even an occupied house could fall into disrepair, diminishing its value, if its owner was experiencing financial difficulties. There is nothing unfair or deceptive about the property inspection and valuation services performed at defendants' direction while the loan was in default.

### C. Adding Attorneys' Fees and Costs to Loan Balance

Plaintiff claims that defendants acted deceptively by adding attorneys' fees and costs to his modified loan balance, although the proposed settlement agreement he'd been offered provided that each party would bear its own fees and costs. Defendants argue that any apparent inconsistency in the loan modification agreement and the proposed settlement agreement is illusory because the settlement agreement expressly provided that "[n]othing in this Agreement will be construed as contradicting the terms of the Loan Modification Agreement with respect to the modified loan terms." (Defs.' LR 56.1 Stmt. ¶ 35; *id.* Ex. 1, Pl.'s Dep. Sealed Ex. 4, Proposed Settlement Agreement ¶ 1, ECF No. 138 at 125.) The loan modification agreement provides that "All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified, . . . nor will this Agreement in any way impair, diminish, or affect any of Ocwen's rights under or remedies on your Note and Mortgage." (Loan Modification Agreement ¶ 9(b), ECF No. 134-1 at 65.) The mortgage, in turn, provides as follows: "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including . . appearing in court; and . . . paying reasonable attorneys' fees . . . . Any amounts disbursed by Lender under this Section . . . shall become additional debt of borrower secured by the Security Instrument." (Defs.' LR 56.1

Stmt. ¶ 25.) The Court agrees with defendants that, based on this contract language, there was nothing deceptive in defendants' actions. *See Sklodowski*, 832 N.E.2d at 197.

Further, even if there were any inconsistency between the proposed settlement agreement and the loan modification agreement, plaintiff admits that he never entered into the settlement agreement (*id.* ¶ 37), so any assurances it might have provided about attorneys' fees could not have altered his expectations or his decision-making in any way. A plaintiff must prove actual damages to prevail on an ICFA claim. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 858-59 (Ill. 2005). When the defendant's allegedly deceptive conduct "simply made no difference" to the plaintiff in any pecuniary sense, the plaintiff "cannot recover under the [ICFA]." *Id.* at 859.

### D. Failing to Dismiss Foreclosure Action Immediately

Plaintiff argues that defendants acted deceptively by failing to dismiss the foreclosure action immediately upon execution of the loan modification agreement, which provided that, "[i]f the Trial Period is successfully completed, any pending foreclosure action will be dismissed" (Loan Modification Agreement ¶ 9(e), ECF No. 134-1 at 65). The Court agrees with plaintiff that defendants' conduct was potentially deceptive in this regard. In particular, US Bank's counsel allegedly told plaintiff that his signing the proposed settlement agreement was a condition of his loan modification, when in fact the terms of the loan modification agreement contemplated the opposite sequence of events—that is, dismissal of the foreclosure action was to *follow* execution of the loan modification agreement, not precede it—and indeed, Ocwen countersigned the loan modification agreement on July 24, 2015, during the pendency of the foreclosure action, without plaintiff's ever having signed the settlement agreement.[2]

---

[2] In his amended complaint, plaintiff mentions the "National Mortgage Settlement" ("NMS"), a consent judgment that allegedly prohibited Ocwen from conditioning the loan modification on a release of claims. Defendants argue that, under the NMS term sheet, the agreement only applies to "loans secured by owner-occupied properties that serve as the primary residence of the borrower," which the May Street property is

13

However, as the Court has already explained above, a plaintiff cannot recover for a violation of the ICFA unless he suffers actual damages, *see Avery*, 835 N.E.2d at 859, which must be economic in nature; "emotional distress, inconvenience and aggravation" are not enough. *Morris v. Harvey Cycle & Camper, Inc.*, 911 N.E.2d 1049, 1054 (Ill. App. Ct. 2009). In his complaint, plaintiff alleges that defendants' deception caused him to incur "additional court appearances, gas, and parking expenses" (Am. Compl. ¶ 84), and it is true that if defendants had agreed to dismiss the foreclosure action at the July 31, 2015 hearing, the first one after execution of the loan modification agreement, plaintiff would not have had to attend court on September 2, 2015. But plaintiff represented himself, so there were no attorneys' fees to pay, and plaintiff's gas and parking expenses are the sort of incidental damages for "inconvenience" that courts have held insufficient to permit recovery under the ICFA. *See Morris*, 911 N.E.2d at 1052-54; *Villasenor v. Am. Signature, Inc.*, No. 06 C 5493, 2008 WL 904888, at *4 (N.D. Ill. Mar. 31, 2008) ("lost time spent shopping" due to deceptive advertisement insufficient to permit recovery); *Reid v. Harvey Motorcycle & Camper*, No. 05 C 5375, 2007 WL 4277435, at *4-5 (N.D. Ill. Nov. 30, 2007) (dealer's deception resulting in botched transaction insufficient to permit recovery where plaintiff was only damaged by having to make several trips to dealership).

### E. Misrepresenting Amount In Escrow Account

Plaintiff claims that defendants acted deceptively by failing to add the amount of any escrow shortage existing at the time of his loan modification to his new loan balance, which would

---

not. Defendants might be correct that the NMS does not apply and they did nothing wrong, at least initially, by asking plaintiff to sign the settlement agreement in exchange for the loan modification, but, viewed in the light most favorable to plaintiff, the evidence shows that, even after Ocwen countersigned the loan modification agreement on July 24, 2015, defendants' attorneys were *still* telling plaintiff, as late as at the July 31, 2015 hearing, that he had to sign the settlement agreement or they would not agree to modify the loan. Given that the loan modification agreement was already fully executed and in effect by then, the alleged conduct could be construed as deceptive and unfair, regardless of the applicability of the NMS.

bring the escrow account current, rather than in arrears. But nothing in the terms of the loan modification agreement required defendants to do this, nor has plaintiff claimed that defendants told him they would. To the contrary, the loan modification agreement provides that plaintiff is required to pay Ocwen certain sums in escrow for taxes and insurance, "in accordance with the terms and conditions of the Security Instrument," which sums may be "adjusted periodically" over the course of the loan. (Loan Modification Agreement ¶¶ 1, 3, 6, ECF No. 134-1 at 64-65.) There was no suggestion in the loan modification agreement that defendants would add plaintiff's escrow shortage to the loan balance, nor does the Court see any other reason why plaintiff would expect them to do so. All the relevant documents provide for a separate escrow account to fund tax and insurance payments so that defendants can protect their interest in the property, and the Court fails to see how capitalizing an escrow shortage and starting an escrow account from scratch helps any party in that regard. Defendants did not act deceptively merely by doing as the contract documents provided, *see Sklodowski*, 832 N.E.2d at 197, nor does the Court find anything else deceptive in defendants' maintaining an escrow account separate from the mortgage loan balance.

For all these reasons, there is no genuine material factual dispute requiring a trial of plaintiff's ICFA claims, and defendants' motion for summary judgment is granted as to those claims.

## II. BREACH OF CONTRACT

Plaintiff's "Third Claim" is that defendants breached their contractual duties under the mortgage, note, and loan modification by charging unwarranted property inspection and valuation fees; "improperly amortizing" his loan modification payments to make it appear that his payment would increase when in fact it would stay the same; failing "to provide accurate repayment and

reinstatement figures" or an "accurate accounting," and failing to "conduct [their] affairs in good faith." (Am. Compl. ¶¶ 92-99.)

To prevail on a breach of contract claim, plaintiff must be able to show "'(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)).

First, to the extent that plaintiff's breach of contract claims arise out of the original note and mortgage, rather than the loan modification agreement, plaintiff cannot prevail because he has not substantially performed under those agreements. Beginning in November 2012, he made no payments for approximately two and a half years. That is a material breach that prevents plaintiff from asserting any breach of contract claim arising out of conduct that occurred while plaintiff was in default. *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 433 (7th Cir. 2009); *cf. Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 691-92 (7th Cir. 2011) (discussing *Hukic*).

Additionally, and regardless of whether the alleged breach is meant to be of the loan modification agreement or the original loan and mortgage, the Court fails to see what contractual provisions defendants are meant to have breached. As the Court has already explained, the mortgage specifically permits defendants to charge plaintiff for property inspections and valuations in the event of a default, and defendants cannot have committed a breach of contract by doing something the contract specifically permits. As defendants explain in their brief, there is "no factual or legal support" for plaintiff's claim about "amortizing" his loan payments, and the Court is unable to identify "any provision of the Note, Mortgage, or Modification Agreement that Defendants have breached by this alleged improper amortization" (Defs.' Mem. in Supp. of Mot.

16

for Summ. J. at 4, ECF No. 132), nor does the Court see how plaintiff has been harmed if, in the end, he is required to pay no more than he expected when he signed the loan modification agreement. Similarly, the Court fails to see what contractual provision defendants breached by failing to provide accurate reinstatement figures or an accounting, or how plaintiff was harmed if they did.

That leaves plaintiff's claim that defendants committed a breach of contract by failing to "conduct [their] affairs in good faith." (Am. Compl. ¶ 96.) Plaintiff does not tie this claim to any specific contractual language, but every contract contains an implied covenant of good faith and fair dealing. The implied covenant is not an independent source of duties; rather, it guides the interpretation of the terms of the contract. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

Plaintiff does not explain what terms of the contract give rise to his claim for breach of the implied covenant of good faith, but his allegation that defendants did not dismiss the foreclosure action immediately after countersigning the loan modification agreement, instead insisting that he must execute the settlement agreement first or they would proceed to foreclosure, might be described as taking "opportunistic advantage" of plaintiff. *See LSREF3 Sapphire Tr. 2014*, 2016 WL 302150, at *3-4. A reasonable jury could conclude that, as soon as defendants countersigned the loan modification agreement on July 24, 2015, after plaintiff made the trial payments due under the agreement, the agreement became a binding contract that required defendants to dismiss the

17

foreclosure action, regardless of whether plaintiff signed a separate settlement agreement, and defendants acted in bad faith by pretending otherwise.

Nevertheless, the claim fails for the same reason plaintiff's similar ICFA claim fails, as the Court explained above: plaintiff did not suffer any resultant damages, or if he did, they were *de minimis*. "[U]nder the doctrine of *de minimis non curat lex* . . . , a breach [of contract] causing only slight harm does not give rise to a remedy." *Bachrach v. Bachrach Clothing Holding Corp.*, 2015 IL App (1st) 143302-U, ¶ 68 (citing *People ex rel. Dep't of Pub. Health v. Wiley*, 843 N.E.2d 259, 269-70 (Ill. 2006) and *Pacini v. Regopoulos*, 665 N.E.2d 493, 497 (Ill. App. Ct. 1996) ("If a contractor's failure of performance causes such slight harm that the courts will give no remedy therefor, . . . it is proper to say that there has been no breach of duty.") (internal quotation marks omitted)). Viewing the facts in the light most favorable to plaintiff, perhaps defendants should have agreed to dismiss the foreclosure action at the July 31, 2015 hearing, rather than insist that plaintiff sign the proposed settlement agreement releasing his claims against them. But plaintiff did not sign the settlement agreement, and on September 2, 2015, barely a month later, defendants agreed to dismiss the foreclosure action anyway. Any harm caused by such a short delay is the sort of "intangible injur[y,] small and . . . difficult to measure," that Illinois law places "outside the scope of legal relief." *Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-CV-1122, 2015 WL 183912, at *15 (C.D. Ill. Jan. 13, 2015) (quoting *Pacini*, 665 N.E.2d at 497) (internal quotation marks omitted).

There is no genuine material factual dispute requiring a trial of plaintiff's breach of contract claims, and therefore defendants' motion for summary judgment is granted as to those claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [131] is granted. Civil case terminated.

SO ORDERED.                                  ENTERED: September 23, 2019

                                             _____
                                             **HON. JORGE ALONSO**
                                             **United States District Judge**